FILED

2009 Feb-18  PM 02:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| FELICIA ANN SANDERSON, | } | |
| | } | |
| Plaintiff, | } | |
| | } | CIVIL ACTION NO. |
| v. | } | 07-AR-2192-S |
| | } | |
| THE COUNTRY CLUB OF | } | |
| BIRMINGHAM, | } | |
| | } | |
| Defendant. | } | |

**MEMORANDUM OPINION**

Felicia Ann Sanderson ("Sanderson") sues her former employer, The Country Club of Birmingham ("the Club"), claiming that the Club terminated her employment in violation of the Family Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* ("FMLA"). The court has before it the Club's motion for summary judgment. For the reasons that follow, the motion will be DENIED.

**PERTINENT FACTS**[1]

Sanderson began working for the Club as a part-time employee in 2003 and as a full-time employee in or around April, 2005. As a

---

[1]     Summary judgment must be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In accordance with Rule 56(c), the narrative statement of facts includes facts that are undisputed by the parties. Where there is a dispute, the facts are presented in the light most favorable to the non-moving party. "The movant 'bears the initial responsibility of informing the district court of the basis of its motion' by identifying those portions of the record that demonstrate the absence of genuine issues of material fact." *Baldwin County, Ala. v. Purcell Corp.*, 971 F.2d 1558, 1563 (11th Cir. 1992) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986)). Thereafter, the burden shifts to the non-movant to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact or that the moving party is not entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(e); *see also Celotex,* 477 U.S. at 324, 106 S. Ct. at 2553. Conclusory allegations or legal conclusions are not enough. *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

full-time employee, she held the title of Snack Stand Supervisor. In this role, she was responsible for supervising snack stands on both golf courses. This included supervision of snack employees, scheduling employees to work, ensuring that snack inventory remained stocked, entering member tickets, and working actual shifts at the snack stands. In order to perform her duties, Sanderson used a golf cart to go between the golf courses.

Sanderson suffers from a sleep disorder. She initially received medical treatment for the disorder in 1998.[2] In 2006, her condition became worse. She started stumbling, had trouble concentrating, fell asleep at unexpected times, and had difficulty waking up, all as a result of exhaustion caused by her sleep disorder. Once, while working, she wrecked a golf cart when she fell asleep at the wheel. On June 18, 2006, Father's Day, Sanderson failed to show up at work for her scheduled shift, sleeping through two alarms and several phone calls. Sanderson informed her immediate supervisor, Andrew Smith ("Smith"), the Food and Beverage Director, that she had overslept as a result of her sleep disorder. She was reprimanded.

The facts from this point on are in dispute, and the time line is difficult to discuss. With the procedural posture in mind, the court will do its best to run through the events preceding Sanderson's termination. Dr. Paul Scalici ("Scalici"), Sanderson's doctor, referred her to a sleep specialist, Dr. William Hays ("Hays"), who counseled Sanderson to undergo sleep studies as part

---

[2]     Sanderson's husband, a Birmingham Police Officer, was killed in the line of duty on January 29, 1998.

of her treatment and evaluation.[3] Although the record is unclear, it appears that this occurred in June of 2006. Sanderson spoke with Smith many times after the Father's Day incident about her need for a sleep study and her need to be off from work. She attempted to schedule a sleep study several times, but cancelled at Smith's request.

Sanderson scheduled a sleep study for July 16, 2006. Prior to that day, she provided Smith documents related to the sleep study. These included sleep study instructions and a brochure on sleep disorders.[4] The sleep study instructions showed the date of the sleep study, July 16, 2006. Both of these items may have been passed on to Cherie Wright ("Wright"), Director of Human Resources for the Club, although Wright remembers specifically seeing and reviewing only the brochure provided by Sanderson to Smith. On July 16, 2006, Sanderson participated in the sleep study, after which Hays ordered more tests and evaluations. Sanderson was instructed to remain off one of the medications she had been taking for her disorder, Provigil,[5] and to return for an additional sleep study

---

[3]    Sanderson alleges that she provided Smith with a statement of diagnosis from Dr. Scalici. However, the Club denies this occurred. The Club also points out that Sanderson did not produce the alleged document in discovery, which is duly noted by the court.

[4]    This is disputed. The Club maintains that the only document Sanderson provided prior to August was a generalized sleep study brochure. However, during his deposition, Smith appears to concede that he may have received documents other than the brochure. (Smith Dep. 37:20-38:12 & 49:3-51:11). Considering the procedural posture, the court will accept Sanderson's statement that she sent both the instructions and the brochure, although it may end up being inconsequential.

[5]    "Provigil is a prescription medication used to improve wakefulness in adults who experience excessive sleepiness" due to one of several sleep conditions. Welcome to Provigil.com, http://www.provigil.com (last visited Jan. 22, 2009).

with a CPAP titration.[6] She returned for another sleep study  on August 2, 2006, with CPAP titration, but the study was not completed. Hayes recommended that Sanderson have a MRI, continue on Provigil, get CPAP desensitization, and have another sleep study.

Sanderson's absence from work began around the time of her July sleep study and extended until her termination on August 15, 2006.[7] In July, 2006, she was entitled to seven vacation days, three sick days, and four personal days, which she took. (Pl.'s Ex. 9). During her absence, Sanderson remained in contact with the Club. Specifically, she informed Smith on several occasions in July and August that she was under testing and evaluation and that Hays could not tell her much until it was complete. Further, Sanderson says that she told Smith in July and August that her doctor told her she could not work. Smith acknowledges that "she may have told [him] that." (Smith Dep. 52:21-53:9). At the end of July, Sanderson questioned Smith about what would happen if she exhausted all of her leave time, because the doctor "still had her off work." (Pl. Mem. in Opp. to Def.'s Mot. for Summ. J. 7). Smith, at some point in July of 2006, told Sanderson that Wright needed more information

---

[6]    "CPAP stands for continuous positive airway pressure." Sleep Studies FAQ, http://www.cdh.org/ClinicalServices.aspx?id=9317 (last visited Jan. 22, 2009). This usually involves fitting the patient with a relatively small mask that goes over the nose. *Id.* The mask delivers "an air pressure through the nose into the back of the airway to splint the airway open during sleep with air." *Id.*

[7]    Sanderson cannot recall the exact date of her last day at work. However, she does agree that it was in mid-July. The Club asserts that it was July 9, 2006. The Club also asserts that, after that date, Sanderson did not work another day. Sanderson testified at deposition that she may have come back to work at some point between mid-July and August, but she is uncertain. (Sanderson Depo. 75:16-77:4).

from Sanderson's doctors. Sanderson then spoke with Wright, who told Sanderson that she needed to know when Sanderson was going to be able to return to work. She also explained that she needed some clarification. Sanderson told her that there was nothing further she could tell her. Sanderson then asked Wright about short-term disability leave or other medical leave and was told that she would need to talk to Smith. Smith, in turn, told her to talk to Wright.

Other than the sleep study instructions and the brochure, the Club was provided no other written materials about Sanderson's disorder or treatment until August 4, 2006, when Hays, at Sanderson's request, faxed a letter to Wright. It stated, "This patient is under evaluation and treatment for sleep disorder." (Pl.'s Ex. 12).[8] Upon receipt of this fax, Wright called Sanderson and informed her that the Club needed documentation that Sanderson was unable to work. Wright also left a message with Hays's office requesting that Hays address the issue of Sanderson's work status. In response, Hays's office left a voice mail message for Wright stating that it would be August 14, 2006, before anything else could be said about Sanderson's condition.

---

[8]       According to Sanderson, she made several requests that Hays send a statement to the Club explaining why she was not at work. He did not comply until August 4, 2006.

Prior to receiving a termination letter on August 15, 2006,[9] Sanderson spoke several times with Smith, informing him of her sleep study status and her need to keep her job. Sanderson says that she asked Smith on more than one occasion for short-term disability leave or FMLA-leave equivalent. Sanderson also spoke with Chris Berlin ("Berlin"), the Club's General Manager, regarding her situation. Berlin wanted to know when Sanderson would be able to return to work. Sanderson told him that she was unsure, that it would be as soon as possible, that she did not wish to lose her job, and that she would come back even if not released by her doctor. Berlin told her not to do that. This conversation occurred on August 15, 2006, the day Sanderson was sent a letter of termination. Sanderson alleges, and Wright, Smith, and Berlin acknowledge it as "possible," that she told each of them on different occasions that she was not at work on her doctor's instructions.

On or around August 14, 2006, Wright recommended to Berlin that Sanderson's employment be terminated for unexcused absences.[10] Berlin approved. The Club sent a termination letter, informing Sanderson that her employment had been terminated for unexcused

---

[9]     The termination letter is dated August 15, 2006. (Pl.'s Ex. 14). However, Sanderson's response to the Club's motion for summary judgment indicates that Sanderson received the termination letter on August 15, 2006. (Pl. Memo. in Opp. to Def.'s Mot. for Summ. J. 12). The letter may have been both sent and received on the same date. In any event, it is inconsequential, and the court will reference the letter as the August 15, 2006, termination letter.

[10]    The Club maintains that Sanderson's absences were not excused because she failed to provide notice from a doctor that she was unable to work during her absence.

absences. A blank FMLA Certification of Health Care Provider Form ("the Form") followed.[11] The August 15, 2006, termination letter provided:

> This letter will serve as notice that your employment with The Country Club of Birmingham has been terminated for unexcused absences. If you think you are eligible for FMLA, please complete the enclosed forms and return to me within twenty-one days. If you qualify for FMLA your employment will be reinstated.

(Pl.'s Ex. 14). Sanderson took the Form to Hays. He completed the Form and forwarded it to the Club. The Form is dated August 28, 2006. In completing the Form, Hays certified that Sanderson's condition qualified as a "serious health condition"[12] under the FMLA, indicating by checkmark that categories (1), (2), (4), and (5) were applicable to Sanderson. (Pl.'s Ex. 5, p.1).

Category (1), "Hospital Care," reads, "**Inpatient care** (i.e., an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity or subsequent treatment in connection with or consequent to such inpatient care." *Id.* at 4 (emphasis in original) (footnote omitted). Category (2), "Absence Plus Treatment," reads as follows:

---

[11]    Sanderson alleges that she received only the first three pages of the four page Form. (Pl. Memo. in Opp. to Def.'s Mot. for Summ. J. 13). She downloaded the last page of the Form from the internet. *Id.*

[12]    Specifically, page one of the Certification of Health Care Provider presents the following question: "Page 4 describes what is meant by a '**serious health condition**' under the Family and Medical Leave Act. Does the patient's condition qualify under any of the categories described? If so, please check the applicable category." (Pl.'s Ex. 5, p.1)(emphasis in original)(footnote omitted). Hays, in filling out the certification, checked the blanks beside numbers (1),(2), (4), and (5), leaving the blanks beside numbers (3) and (6) untouched.

(a)  A period of incapacity of **more than three consecutive calendar days** (including any subsequent treatment or period of incapacity relating to the same condition), that also involves:

(1)  **Treatment[13] two or more times** by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (*e.g.*, physical therapist) under orders of, or on referral by, a health care provider, or

(2)  **Treatment** by a health care provider on **at least one occasion** which results in a **regiment of continuing treatment** under the supervision of the health care provider.

*Id.* (emphasis in original)(footnote omitted). Category (4), "Chronic Conditions Requiring Treatments," reads as follows:

A **chronic condition** which:
(1) Requires **periodic visits** for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;
(2) Continues over an **extended period of time** (including recurring episodes of a single underlying condition); and
(3) May cause **episodic** rather than a continuing period of incapacity (*e.g.* asthma, diabetes, epilepsy, etc.).

*Id.* (emphasis in original)(footnote omitted). Category (5), "Permanent/Long Term Conditions Requiring Supervision," reads, "A period of **incapacity** which is **permanent or long-term** due to a condition for which treatment may not be effective. The employee or family member must be **under the continuing supervision of, but need not be receiving active treatment by, a health care provider**." *Id.* (emphasis in original)(footnote omitted).

---

[13]     Treatment includes examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examinations, eye examinations, or dental examinations. (Pl.'s Ex. 5, p.4 n.3).

When asked to "[s]tate the approximate **date** the condition commenced, and the probable duration of the condition (and also the probable duration of the patient's present **incapacity** if different)," Hays responded, "See above. OSA & PLMS duration unknown, will probably be life long."[14] *Id.* at 1. (emphasis in original)(footnote omitted). The "See above" references Hays's certification that Sanderson's sleep disorder commenced in 1998. When asked to certify whether "it will be necessary for [Sanderson] to take work only **intermittently or to work less than full schedule** as a result of the condition," Hays responded, "**Normally** can work full schedule." *Id.* (first emphasis in original)(second emphasis added). When asked to certify "whether the patient is presently incapacitated and the likely duration and frequency of **episodes of incapacity**," Hays responded, "Can work – conte[15] the CPAP nightly & naps if tolerated, meds + don't drive if drowsy." *Id.* (emphasis in original)(footnote omitted). Hays also certified that Sanderson

---

[14]     The court can make an educated guess as to what Hays refers to when he certifies that Sanderson suffers from OSA & PLMS. OSA is an acronym for Obstructive Sleep Apnea. "In obstructive sleep apnea, the upper airway narrows, or collapses, during sleep. Periods of apnea end with a brief partial arousal that may disrupt sleep hundreds of times a night." Nighttime Breathing, http://news.bio-medicine.org/medicine-news-3/Nighttime-breathing-mask-decreases-blood-pressure-in-people-with-sleep-apnea-4649-1 (last visited Jan. 26, 2009). PLMS is an acronym for Periodic Limb Movements, which occur when an individual has episodes of "simple, repetitive muscle movements," that they cannot control. *See* Periodic Limb Movements, http://www.sleepeducation.com/Disorder.aspx?id=10 (last visited Jan. 26, 2009). These movements usually do not keep an individual from falling asleep, rather, they severely disrupt sleep during the night and result in fatigue the next day. *Id.*

[15]     The court believes this may be short for "continue."

would need "complete CPAP titration," in addition to the
continuation of medication, additional office visits, "occasional
overnight sleep study," and "rare day time NAP study." *Id.* at 2.
When asked, "If medical leave is required for the employee's
**absence from work** because of the **employee's own condition** . . . ,
is the employee **unable to perform work** of any kind," Hays
certified, "Can work on meds & therapy." *Id.* Finally, when asked,
"If able to perform some work, is the employee **unable to perform
any one or more of the essential functions of the employee's job** .
. . ," Hays certified, "if unable to work due to sleepiness – would
need [word unknown] re-evaluate [or re-evaluation]."[16] *Id.*

It is important to note that all references to "incapacity" on
the Form, for purposes of FMLA, "is defined to mean **inability to
work**, attend school or perform other regular daily activities due
to the serious health condition, treatment therefor, or recovery
therefrom." *Id.* at 1 n.2 (emphasis added).

Wright testified that at the time she received the Form, she
understood that Sanderson, according to Hays, suffered from a
serious health condition which caused incapacity (as defined on the
Form), that Sanderson was in need of an additional sleep study, and
that Sanderson was under a doctor's care, evaluation, and

---

[16]    The court has done its best to read Hays's writing and is left
wondering why the parties failed to depose him in order to clarify his words and
intent.

treatment. (Wright's Dep. 123:11-124:16). Berlin testified that he reviewed the Form and that, although he did not fully understand what it signified and understood only what was written legibly, he made the determination that Sanderson's termination would stand. (Berlin's Dep.  52:2-55:4). The Club, namely Wright and Berlin, believed the Form lacked a statement that Sanderson was unable to perform her job, relying largely on Hays's statement that Sanderson "normally can work [a] full schedule." *Id.* at 1. As a result, the Club sent Sanderson a follow-up letter on September 6, 2006. The Club did not request second or third medical opinions. The letter stated in pertinent part:

> The Certification of Health Care Provider form from Dr. Hays is not sufficient for us to place you on FMLA leave. The form says that you can work, that normally you can work a full schedule, and that other than 3 to 6 doctor visits a year along with an occasional overnight sleep study and a rare daytime nap study there is no reason for you to be off work.
>
> Based on that, we cannot place you on FMLA leave, which means that your employment remains terminated.
>
> We will be glad to consider any information you want to provide that will establish that you have been unable to report to work because of a serious health condition. It is up to you to show us that your medical condition or treatment has prevented you from reporting to work during your lengthy absence. The time limit for you to do this has expired, but we will still consider anything that you submit by September 19.

(Pl.'s Ex. 15). Wright signed this letter with Berlin's approval.

Sanderson called the Club several times after receiving the September 6, 2006, letter. She spoke with Smith on one occasion,

and he told her that Wright and the others did not think she provided the proper information to the Club. She told him that she did not know what else she could provide and thought she had done everything they asked. Smith told her he would get back with her, but he did not. Sanderson also spoke with Wright and Berlin, letting them know that she had given them all she had and that she did not want to lose her job. Sanderson also spoke with Hays about the situation, and he responded that "he [didn't] know what more he could tell them at this point." (Sanderson Dep. 171:11-13). Sanderson did not provide the Club with any additional documentation, and the Club did not reinstate her.

## EXHIBITS K AND L

The Club has provided certain portions of Sanderson's medical records from Hays's and Scalici's offices. These records are the Club's Exhibits K and L, which were the target of a motion to strike by Sanderson filed on December 18, 2008. The court, denying the motion to strike, afforded Sanderson the opportunity to respond. Included in Exhibits K and L are telephone message records dating from approximately July 12, 2006, to November 1, 2006. Those messages evidence that both Sanderson and Wright asked Hays to send notice to the Club of her inability to work and contain only one statement by Hays regarding Sanderson's ability, or inability, to work or return to work. A message dated October 30, 2006, after Sanderson's termination, reads, "Needs release from work off since

3rd w[ee]k of July." (Def.'s Ex. K). The response reads, "ok to go back to work." *Id.* In addition to the phone messages, the only other relevant information[17] contained in Exhibits K and L can be found in Hays's dictation of August 4, 2006, and a document entitled, "Sleep Lab History & Physical" ("Lab Note"). In Hays's August 4 dictation, under the heading "history," he notes the following, in relevant part:

> The patient returns for followup of excessive daytime sleepiness, sleep disorder. She requires 400 mg of Provigil to be at all functional. She knows not to drive if drowsy. This dosing allows her to drive back and forth to work safely. She recently underwent polysomnogram on 07/16/06. . . . . She is here for reevaluation. She needs documentation for her employer that she is under evaluation and treatment for a sleep disorder. This would account for occasional sleepiness at work. I have typed this document, and provided it to her. She would be agreeable to desensitization to a full face mask.

*Id.* The Lab Note states in relevant part as follows:

> IMPRESSION/RECOMMENDATIONS: The patient has had an incomplete response to Provigil. I have asked her to not drive if drowsy and, if possible, she will reduce or wean off the Provigil prior to scheduled polysomnogram. If her polysomnogram is positive for obstructive sleep apnea syndrome then we will treat that with CPAP as appropriate. If her sleep study is negative for obstructive sleep apnea syndrome, she will need an MSLT the following day to assess the possibility of narcolepsy, idiopathic hypersomnia, etc. Will also order narcolepsy serology today. She understands the course of proposed work-up and is in agreement. Again, she knows not to drive if drowsy and will take appropriate precautions, therapeutic naps, etc. She will return in six weeks for assessment.

---

[17]     Relevant in the sense that the court may use it to make its decision.

*Id.* Nowhere in the records provided is there an explicit and unambiguous statement by any doctor that Sanderson could or could not work, save that already mentioned.

## ANALYSIS

The FMLA entitles an eligible employee to twelve (12) weeks of unpaid leave during any twelve (12) month period because of "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). When leave is necessary because of such a condition, an employee may take reduced or intermittent leave. *Id.* § 2612(b). After a period of qualified leave, an employee is entitled to reinstatement to her former position or an equivalent position. *Id.* § 2614(a). It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" in the FMLA. *Id.* § 2615(a)(1). It follows that an employer who interferes with an employee's exercise of FMLA rights violates the FMLA, and the employee has a right to bring a civil action for the violation. *Id.* § 2615(a).

Both employer and employee have certain duties under the FMLA. An employee must give her employer notice of the need for FMLA leave. Where an employee's need to take leave is foreseeable, thirty (30) days advance notice of the need must be provided unless it is impracticable to do so because of lack of knowledge, a change in circumstances, a medical emergency, or other contingencies. 29

U.S.C. § 2612(e)(2)(B); 29 C.F.R. § 825.302(a)(effective to Jan. 15, 2009)[18]; *Cruz v. Publix Super Markets, Inc.*, 428 F.3d 1379, 1382 (11th Cir. 2005). "Similarly, if the need for leave is not foreseeable, notice must be given 'as soon as practicable under the facts and circumstances of the particular case.'" *Cruz*, 428 F.3d at 1382 (quoting 29 C.F.R. § 825.303(a)(effective to Jan. 15, 2009)). Where the need for leave is unforeseeable, an employee "need only provide her employer with notice sufficient to make the employer aware that her absence is due to a *potentially FMLA-qualifying reason*." *Id.* (quoting *Gay v. Gilman Paper Co.*, 125 F.3d 1432, 1436 (11th Cir. 1997)(internal quotation marks omitted)(emphasis in original). An employee need not "expressly assert rights under the Act or even mention the FMLA to meet his or her obligation to provide notice." 29 C.F.R. § 825.208(a)(2)(effective to Jan. 15, 2009).

Once an employee provides her employer with sufficient notice that potentially FMLA-qualifying leave is necessary, the burden shifts to the employer to "ascertain whether the employee's absence actually qualifies for FMLA protection." *See Cruz*, 428 F.3d at 1382 (citing *Strickland v. Water Works & Sewer Bd. of the City of Birmingham*, 239 F.3d 1199, 1203 (11th Cir. 2001)). An employer may

---

[18]    Although the parties failed to point the court to the effective regulations relevant for purposes of this motion, the court notes that the applicable FMLA regulations are those that were in place in 2006, when the events leading up to this action occurred. Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988). The parties failed to notice this point.

insist that its employees provide medical certification to verify FMLA leave eligibility. 29 U.S.C. § 2613(a). Certification is sufficient if it includes:

> (1) the date on which the serious health condition commenced; (2) the probable duration of the condition; (3) the appropriate medical facts within the knowledge of the health care provider regarding the condition; . . . (4)(B) . . . a statement that the employee is unable to perform the functions of the position of the employee.

*Baldwin-Love v. Elec. Data Sys. Corp.*, 307 F. Supp. 2d 1222, 1229 (M.D. Ala. 2004)(quoting 29 U.S.C. § 2613(b) and citing *Parris v. Miami Herald Pub. Co.*, 216 F.3d 1298, 1302 n.2 (11th Cir. 2000)). Notice must be provided of such certification requirement, and of the consequences of failure to comply, every time an employee requests FMLA leave. *See* 29 C.F.R. § 825.305(d)(effective to Jan. 15, 2009). "The Department of Labor also mandates that 'the employer shall advise an employee whenever the employer finds a certification incomplete, and provide the employee a reasonable opportunity to cure any deficiency.'" *Baldwin-Love*, 307 F. Supp. at 1229 (quoting 29 C.F.R. § 825.305(d)(effective to Jan. 15, 2009)). Notice of a certification requirement must be written unless the employer has, within the preceding six (6) months, given an employee the required written notice regarding the FMLA and the employer's policies.[19] 29 C.F.R. § 825.301(c)(effective from Mar. 30, 1995, to Jan. 16, 2009). Otherwise, oral notification is

---

[19]    This written notice is in addition to an employee handbook outlining the employer's policies regarding FMLA leave and certification. *Id.*

permissible. *Id.* When an employee's leave is unforeseeable, the employer must allow the employee at least fifteen (15) calendar days to comply with a certification request. *Id.* § 825.305(b)(effective to Jan. 15, 2009). Because "[a]n employee's right to FMLA leave is subject to the certification requirements of 29 U.S.C. § 2613[,] . . . [f]ailure to meet the certification requirements renders the employee's absences unprotected by the FMLA." *Id.* (citing 29 U.S.C. § 2612 and *Cash v. Smith*, 231 F.3d 1301 (11th Cir. 2000)).

To prove her FMLA claim of interference, Sanderson "must demonstrate that [s]he was denied a benefit to which [s]he was entitled under the FMLA." *Martin v. Brevard County Pub. Sch.*, 543 F.3d 1261, 1266-67 (11th Cir. 2008)(citing 29 U.S.C. § 2615(a)(1) and *Strickland*, 239 F.3d at 1206-07). In order to make this showing, Sanderson must establish: (1) that she was an eligible employee of the Club;[20] (2) that she was entitled to leave under the FMLA; (3) that she gave the Club proper notice of her need to take leave; and (4) that the Club denied her benefits to which she was entitled. On summary judgment, however, Sanderson need only raise

---

[20]    It is undisputed that the Club employed Sanderson and that she was an eligible employee under both the FMLA and Club policy. An eligible employee under the FMLA is "an employee who has been employed-(i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A). It is also undisputed that Sanderson suffered an adverse employment action, namely, the loss of her job, which was causally connected to her FMLA leave, if she was in fact engaging in a protected activity.

-17-

a material issue of fact regarding her entitlement to a FMLA benefit denied to her by the Club.

The court finds, and the Club does not explicitly deny, that Sanderson has met her summary judgment burden of showing that she suffered from a serious health condition. Although there does not appear to be a dispute between the parties regarding this crucial fact, it is certainly an undisputed fact worthy of note. A serious health condition is "an illness, injury, impairment, or physical or mental condition that involves . . . (B) continuing treatment by a health care provider." 29 U.S.C. § 2611. The facts presented suggest that Sanderson did, in fact, suffer from a serious health condition: a sleep disorder. This disorder caused her to stumble, have trouble concentrating, fall asleep at unexpected times, and have trouble waking. It even led to a workplace accident, the wrecking of a golf cart. Sanderson's submission of the fax from Hays and the Form filled out by Hays evidence that she suffered a serious health condition. The fax, dated August 4, 2006, states, "This patient is under evaluation and treatment for sleep disorder." (Pl.'s Ex. 12). Further, in completing the Form, Hays certified that Sanderson's condition qualified as a serious health condition under the FMLA, indicating by checkmark the categories applicable to Sanderson. Viewing these facts in the light most favorable to Sanderson, the court concurs with the obvious, namely that she suffered from a serious health condition for purposes of

the FMLA. Thus, the court believes the question of whether there is a genuine issue of material fact regarding an interference with a protected FMLA right turns on an inquiry into whether Sanderson has sufficiently alleged and evidenced that she abided by proper certification procedure in notifying the Club of a FMLA-qualifying reason to justify her extended absence. In turn, the court must also ensure that evidence in the record indicates, with or without dispute, that the Club met its FMLA obligations, at least to the extent necessary at summary judgment stage.

**_Did Sanderson satisfy the Club's certification requirements?_**

The Club contends that Sanderson has failed to demonstrate that any of the five weeks of work that she missed in the summer of 2006 are entitled to FMLA protection. The crux of the Club's argument is the allegation that "none of the information that she or her doctors provided [the Club] satisfies the FMLA certification requirements because the medical certifications never stated that she was unable to perform her job." (Def.'s Br. in Supp. of Mtn. for Sum. J. 9). In fact, the Club points out, "the most complete of the medical documents, the FMLA medical certification form completed by Dr. Hays, <u>states exactly the opposite: it states that she "normally can work a full schedule."</u> _Id._ (emphasis in original). The Club correctly states the law, that "[f]ailure to meet the certification requirements renders the employee's absences unprotected by the FMLA," _Laura Baldwin-Love_, 307 F. Supp. 2d at

1229 (citing *Cash*, 231 F. 3d at 1307). However, the Club overlooks the ambiguity in the Form, choosing instead to focus on statements in the Form that supports its position. The court cannot overlook this ambiguity considering the procedural posture, which requires the court to view the evidence in the light most favorable to Sanderson.

The Club argues that the Form "did not state that Sanderson was unable to work or had been unable to work at any time relating to her sleep disorder," averring that, "[t]o the contrary, the form stated that she could work, that normally she could work a full schedule and that, other than 3-6 doctor's visits a year along with an occasional overnight sleep study and a rare daytime nap study, there was no reason for her to be off work." (Def.'s Br. in Supp. of Mot. for Sum. J. 10). However, Hays's answers on the Form do not make the certification inadequate as a matter of law. At best, the answers on the Form are ambiguous. The court agrees that the Form states that Sanderson can **normally** work a full schedule. However, the court finds the word **normally** to be operative and arguably indicative of a situation wherein Sanderson could not work a full schedule, or at all for that matter. Perhaps Hays, in responding to the question, believed he was certifying that Sanderson's current inability to work was not normal, and that, once she had undergone testing and maintained the use of her medication, she would be able to return to "normal." The court certainly cannot rule this

interpretation out on the record before it. What Hays did not do is to reply with an unambiguous, "No." As for Hays's response, "can work," when asked "whether the patient is presently incapacitated and the likely duration and frequency of episodes of incapacity," (Pl.'s Ex. 5, p.1), the court finds this response is compromised by the date on which the Form was filled out, August 28, 2006, well after Sanderson's termination and after the relevant time period had passed. The same is true for Hays's certification that Sanderson, "can work on meds + therapy." *Id.* at 2. Sanderson's condition on August 28, 2006, is of no concern to the court. Sanderson had already been terminated. And, the court cannot conclude with certainty which time period Hays spoke to in completing the Form.

Complicating matters, Hays clearly checked categories (1), (2), (4), & (5), indicating their applicability to Sanderson's condition. The description for category (2), "**Absence Plus Treatment**," reads, "A **period of incapacity** of **more than three consecutive calendar days** (including any subsequent treatment or period of incapacity relating to the same condition) . . . ." *Id.* at 4 (footnotes omitted)(second emphasis added). The Form defines incapacity, for purposes of the FMLA, as "**inability to work** . . . ." *Id.* at 1 n.2. Hays, having signed the Form, is assumed to have read it in its entirety. And, while his certification on the Form that Sanderson suffered from a serious health condition that

resulted in a period of incapacity, which Hays was notified meant the "inability to work," *see* 29 C.F.R. § 825 app. B (effective to Jan. 15, 2009), could be at odds with his other statements on the same Form, the court cannot ignore it. Nor can the court be certain that the Form, when viewed in light of the surrounding circumstances, is not sufficiently ambiguous that a reasonable jury could return a verdict for Sanderson.

The Club cites *Cash v. Smith*, as a case on point on the issue of "failed certification." 231 F.3d 1301. This case is distinguishable. The district court in *Cash* disposed of Cash's claim under the FMLA for failure to prove a *prima facie* case, explaining, "In this case, at the point that [the employer] was put on notice that Cash's intermittent absences were potentially FMLA qualifying, [the employer] provided Cash with the appropriate paperwork. Cash's physician, however, determined that Cash did not require FMLA leave and Cash did not turn in the FMLA paperwork." *Cash v. Smith*, No. 98-1367 (N.D. Ala. 1998)(Order and Op. granting Summ. J.); *see Cash*, 231 F.3d at 1304, 1307 (holding that, because Cash's personal physician indicated that Cash did not qualify for FMLA leave, summary judgment was properly granted). In contrast, Sanderson did turn in the Form to the Club, and the Form did not clearly indicate that Sanderson did not qualify for FMLA leave. Instead, it was facially ambiguous.

Exhibits K and L contain information that was not known to the Club at the time it had to make its decision. Thus, little weight, if any, can be placed on this evidence. However, being that the Club did provide this information, it is telling that there was no explicit mention of ability to work, with one exception. On October 30, 2006, Sanderson called Hays's office and someone at his office took the following phone message, "Needs release from work off since 3rd of July." (Def.'s Ex. K). The response to that message reads, "ok to go **back** to work." *Id.* This seems to indicate that, at some point, it was not okay for Sanderson to work. At best, it creates even more ambiguity. The records provided in Exhibits K and L also contain language such as, "She needs documentation for her employer that she is under evaluation and treatment for a sleep disorder. This would account for occasional sleepiness at work." *Id.* Without the doctor's explanation, it is difficult to tell whether he believes Sanderson would be accounting for the problems with sleepiness she had at work prior to taking leave, or whether he meant current problems with sleepiness at work because she had not been told to take off work. When viewed in the light most favorable to Sanderson, the non-moving party, the court finds a genuine issue of material fact.[21]

This conclusion is especially true when viewed in light of Sanderson's testimony that her doctor instructed her not to return

---

[21]    Of course, the information provided in Exhibits K and L is not necessary to this finding, as the court reached this conclusion without it.

to work. If the Club means to call into question the credibility of Sanderson's testimony by submitting Exhibits K and L it should know that, given the procedural posture, the court cannot weigh the credibility of Sanderson in making its determination. *See Allen-Sherrod v. Henry County Sch. Dist.*, 248 Fed. Appx. 145, 147 (11th Cir. 2007) ("It is hornbook principle that it is not proper for a district court to assess witness credibility when consider[ing] a motion for summary judgment as such determinations are reserved for the jury."). And, in any event, there is nothing that directly conflicts with Sanderson's statements. The court will not interpret silence in the record for an explicit negative.

### Did the Club meet its FMLA obligations?

Sanderson argues in her response to the Club's motion for summary judgment that the Club violated the FMLA's notice provisions, because it failed to give proper written notice of the requirement for, or make a proper written request for, certification. According to Sanderson, the Club's August 15, 2006, letter was insufficient. She reasons that, as a result, the September 6, 2006, letter was the first written notice from the Club and it gave her inadequate time to respond. In turn, the Club replies that "Sanderson's arguments in this regard are completely meritless for two reasons." (Def.'s Reply Br. 3). First, they contend, the August 15 letter did satisfy FMLA requirements. Second, even if it did not, Sanderson was not prejudiced by the

violation. The Club does not speak to Sanderson's argument that the Club failed to provide her with proper written notice of the need for certification. Sanderson's first argument is well taken. There is no need to reach the second, which is the only one addressed by the Club.

The court is uncertain whether Sanderson raises the Club's failure to advise and notify her in compliance with the FMLA in an attempt to bring an independent failure to advise claim or whether she raises this fact exclusively in support of her cause of action. Considering the procedural posture, the court will assume the latter. As a result, the court will evaluate how well the Club met its duties under the FMLA only to the extent that it sheds light on whether Sanderson has raised a material issue of fact regarding her entitlement to a FMLA benefit that was denied to her. What the court does not intend to do with this opinion is pass on the strength of such a claim outside of the summary judgment context.

Once Sanderson provided the Club with sufficient notice[22] that potentially FMLA-qualifying leave was necessary, the burden then shifted to the Club to find out whether she actually qualified for FMLA leave. *See Cruz*, 428 F.3d at 1382 (citing *Strickland*, 239 F.3d at 1203). Sanderson properly concedes that the Club had every right to insist that she provide medical certification from her treating

---

[22]      The Club does not dispute the sufficiency of Sanderson's notice, nor does the court find it deficient. Sanderson gave oral notice on several occasions sufficient to alert the Club to the fact that she might qualify for FMLA leave.

physician to verify her eligibility for FMLA leave. 29 U.S.C. § 2613(a). However, the regulations insist that notice be provided of such a requirement, and the consequences of failure to comply, **every time** an employee requests FMLA leave. *See* 29 C.F.R. § 825.305(a)(effective Jan. 15, 2009). "Such notice must be **written notice** whenever required by 29 C.F.R. § 825.301." *Id.* The Club orally requested Sanderson provide it with something stating that she was unable to work many times during her absence. However, it never supplied her with written notice of the need for certification and of the consequences of her failure to obtain sufficient certification. Thus, the Club's oral request for certification was insufficient. *See Cooper v. Fulton County, Georgia*, 458 F.3d 1282 (11th Cir. 2006)(holding that "the County's oral request for certification . . . was not sufficient because the County had not provided [plaintiff] with written guidance on the FMLA or the County's medical certification requirement (and consequences for failure to comply) within the preceding six-month period")(citing 29 C.F.R. § 825.301(c)(effective from Mar. 30, 1995, to Jan. 15, 2009)). Because there is no evidence suggesting that Sanderson had been given the required written notice within the preceding six months of her taking of leave, which would have released the Club from the burden of giving her notice again, the court finds that the Club violated the FMLA in failing to give written notice to Sanderson of the certification requirement.

The regulations also provide that "the employer should request that an employee furnish certification . . . **at the time the employee gives notice of the need for leave** or **within two business days thereafter**, or, in the case of unforeseen leave, **within two days after the leave commences**." 29 C.F.R. § 825.305(c). Sanderson began taking leave in July of 2006. At no time until the date of her termination on August 15, 2006, did the Club provide her with written notification of the certification requirement or otherwise make a request that she provide certification. This is evidenced by the fact that the Form accompanied her termination letter. The fact that the Club ultimately sent a follow-up letter informing Sanderson that the Form was insufficient and giving her even more time to file a sufficient certification is inconsequential.

In *Cooper*, the County, after being given notice of plaintiff's need for potentially FMLA-qualifying leave, made an oral request for certification on July 13, 1998. 458 F.3d at 1286. This request was found to be insufficient because the County failed to give plaintiff written guidance on the FMLA or its medical certification requirement, along with the consequences for failure to comply, within the preceding six months. *Id.* The Eleventh Circuit also held that an August 4, 1998, letter that only provided plaintiff six days to turn in the required medical certification was not in compliance with the FMLA. *Id.* The Eleventh Circuit reasoned, "Because this requirement was not in compliance with the FMLA, the

-27-

County was not entitled to take action against [the plaintiff] for failing to comply within the time allowed." *Id.; see* 29 C.F.R. § 825.301(f)(effective from Mar. 30, 1995, to January 15, 2009)("If an employer fails to provide notice in accordance with the provisions of this section, the employer may not take action against an employee for failure to comply with any provision required to be set forth in the notice."). That reasoning is persuasive in the current case. At the point at which the Club sent its August 28, 2006, letter to Sanderson, the Club was in noncompliance with the FMLA.[23]

**Was Sanderson prejudiced by the Club's FMLA violation?**

The Club contends that Sanderson's argument that it violated the FMLA fails because she was not prejudiced by the violation, citing *Ragsdale v. Wolverine Worldwide, Inc.*, 535 U.S. 81, 89 (2002). (Def.'s Reply Br. 4). Although there is little, if any, Eleventh Circuit opinions on the matter, the opinion of other circuits are informative. The Third Circuit noted, in *Conoshenti v. Public Serv. Elec. & Gas Co.*, that *Ragsdale*, while not dispositive of the issue before that court, or before this one, "is helpful, however, because the Court found 'reasonable' [the plaintiff's] suggestion that a failure to advise of FMLA rights could constitute

---

[23]     The court reiterates that this determination, and the effect it will have on Sanderson's claim, is being made here for purposes of summary judgment only. If, for instance, a jury finds that Sanderson was, in fact, never told that she was unable to work, the effect of the Club's noncompliance may shift. Or, it may not. This is a matter to be handled at trial.

an interference with 'an employee's exercise of basic FMLA rights in violation of [29 U.S.C.] § 2615." 364 F.3d 135, 143 (3rd Cir. 2004). A failure to advise in writing of the need for certification and the consequences of a failure to provide certification can be likened to a failure to advise of FMLA rights more generally. The court could be persuaded that Sanderson would have to show, to the satisfaction of a jury, prejudice as a result of the Club's noncompliance in order to prevail. *See id.* at 144; *see also Downey v. Strain*, 510 F.3d 534, 540 (5th Cir. 2007)("A regulation must not relieve employees of the burden of proving any real impairment of their rights and resulting in prejudice.")(internal quotations omitted)(citing *Ragsdale*, 535 U.S. at 90). However, the Club's motion for summary judgment would still fail.

Unfortunately, neither party adequately briefs the failure to advise issue. The Club relies only on its primary argument, that Sanderson at no time showed that she was unable to work. It follows, under its logic, that she cannot demonstrate prejudice, because she could never have shown her inability to work, regardless of if, and when, she was given notice. The Club makes this argument in its reply brief. Sanderson, likewise, neglects this issue, both in her complaint and response to the Club's motion for summary judgment. Ordinarily, the Club would bear the burden of proof to identify those portions of the pleadings, and other evidentiary submissions, that it believes demonstrate the absence

of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Here, the Club has never asserted that Sanderson has not met and could not meet her burden of proving that she was prejudiced by its violation of the FMLA. Sanderson does not address this distinct issue in her complaint. She did, however, put the court and the Club on notice that she would attempt to prove that the Club violated the FMLA. But, the complaint contains no mention of the violation of the specific notice provisions currently at issue. The court cannot fault the Club for failing to draw attention to its own violation of the FMLA by preemptively arguing that Sanderson could not prove that the violation prejudiced her.

What the court is left with is insufficient briefing on the matter. The Club raises the issue of Sanderson's inability to prove prejudice in reply to Sanderson's response that the Club violated the FMLA by failing to adhere to the notice provisions. Thus, Sanderson had no real opportunity to respond with specific facts establishing a genuine issue with respect to the prejudice requirement. The court cannot hold this against either party, but must do its best to decide the prejudice issue on its own for purposes of summary judgment. When looking at the facts in the light most favorable to Sanderson, the court concludes that Sanderson may, in fact, have been prejudiced by the Club's lack of written notice of the certification requirement. And, even if she

was not, the fact of the noncompliance, when looked at in the light most favorable to Sanderson, lends support to the conclusion that a reasonable jury could find in favor of Sanderson. As already discussed, part of the ambiguity in the Form arises from the fact of its date of completion, August 28, 2006, well after Sanderson's August 15, 2006, termination date. Had Sanderson received written notification of her need to obtain certification within the time period set out in the regulations, she may have presented the Form to Hays sooner and received clearer and more accurate responses as a result. Had Hays filled out the Form on August 1 instead of August 28, much of the court's concern over the Form's ambiguity may have been alleviated. This, however, was not the case.

The Club relies heavily on the fact that Sanderson failed to provide any further information about her ability to work after the Form was submitted. Its reliance is misplaced. The Form provided on August 28, as already discussed, was ambiguous at best. Looking at the facts in the light most favorable to Sanderson, a jury might find the Form sufficient or insufficient. While the Club certainly has a right under normal circumstances to request clarification, the fact that none was given, or could be given, may be the result of the timing of the request. Hays filled out the Form on August 28. When he received an additional request for information, he had no additional information to give. As a result, Sanderson provided the Club with no additional information. But, the Club had already

-31-

terminated her. In fact, the Club terminated her before it gave her notice of her need for certification. The court cannot conclude that Sanderson was not prejudiced by this noncompliance. Likewise, the court cannot conclude that Sanderson's first certification form is wholly insufficient, not based on the evidence currently before it. The failure of the Club to comply with the FMLA, which exacerbates the ambiguity surrounding the Form and Sanderson's work status, the failure of the parties to provide enough evidence, namely, the failure to depose Hays, to clear up the ambiguity, and the failure of the parties to adequately brief several issues leads the court to its only conclusion considering the procedural posture.

**CONCLUSION**

Whether the evidence will ultimately sustain inferences in Sanderson's favor that will allow her to prevail on her claim is unknown. However, Sanderson has raised sufficient issues of material fact as to her FMLA claim to survive the Club's motion for summary judgment. This court did not write the FMLA. It is, however, sworn to uphold it.

DONE this 18th day of February, 2009.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

-32-